Good morning, and please support. I'm Patrick McGillicuddy, and I represent habeas petitioner Christian Dale Lowry. He was convicted of first-degree murder in the Avapai County Superior Court, State of Arizona. He received a life sentence. He's eligible for parole in 25 years. I know the Court's read my briefs. We allege that the trial counsel for Mr. Lowry was ineffective because he chose the absolutely worst strategy Misidentification instead of self-defense. Excuse me? Misidentification. Versus self-defense. And we One of the problems I have with these IAC cases is that we're often asked to second-guess strategic decisions that are made. And unless you can establish that there was absolutely no basis upon which this theory might not have at least potentially worked, it seems to me that we're left with the choice that the attorney made, you know? I disagree respectfully with the Court. In many of the ineffective assistance cases that this Court has ruled on, the Court has affirmed the lawyer's strategy, even though somebody might have done it different because the lawyer is faced with two or three maybe potential defenses, neither one of which is very good. In this case, you have a stark contrast between what the lawyer selected and what was a viable and perhaps a winnable defense. And I base the argument on several things. First of all, the selection itself was unreasonable. And I base that on this. The facts of the case are very straightforward. Mr. Lowry was in a bar. He had a little confrontation with another individual. They end up in the men's room hallway. Unfortunately, in the presence of Mr. Mincheski, who's got lousy eyesight. Well, to be fair to Mr. Mincheski, he had some physical limitations that I think counsel knew about, because I think the record shows that one of the police officers had to help Mr. Mincheski fill out the witness form because he couldn't see the questions that were on that form. Now, what occurred in the hallway is very clear. My client was confronted by Mr. Vasquez, who admitted he was in the Mexican mafia. The record seems to indicate that he took his shirt off. And in Prescott or in Yavapai County, Arizona, that's kind of an indication that somebody wants to do you physical harm. And then the other individual named Yellow Shirt all of a sudden now is behind Mr. Lowry, and he's in a very narrow space confronted by two individuals. And as he told the police, he swung at Mr. Vasquez. He had a fishing knife in his hand, and he ended up killing Mr. Vasquez. That's what he said to the police when he was apprehended. The police did a search of the vehicle. They found a bloody knife. The subsequent physical examination showed that the victim's blood through DNA was on that knife. Mr. Lowry made a number of spontaneous admissions to the police, most of which are, I did it, it was self-defense, you would have done it too, he had blood on his clothes. Now, when as a lawyer you're looking at what are the facts of the case and what do I need to investigate in Strickland v. Washington, Justice O'Connor was clear. Well, the first level of investigation essentially is you ask your client what happened. Here the lawyer already knew that. He knew that Mr. Lowry had made very compelling admissions that he had stabbed this victim. The physical evidence was irrefutable that it was the victim's blood on Mr. Lowry's clothing and knife. But wouldn't you be stuck if you went the route of self-defense with the testimony of the witness who heard him say, I'm going to kill you, you so-and-so? Well, and you might be able to explain that to the jury, that that was in response to threats made by these two individuals who were trying to kill him and perhaps it was just in the heat of the moment that Mr. Lowry said those things. And the other thing, Your Honor, if I may say, is by the same token, couldn't he have evaluated that particular piece of evidence and say, you know, that's too high a risk to run? Well, certainly I think any lawyer would do that. But the other focus of my argument, Judge, is not only did, in my view, his lawyer totally ignore the facts of the case that would be presented to the jury, he ignored the opportunity to shape the argument on those facts to put my client in the best position to obtain an acquittal or a lesser charge, and he ignored very favorable Arizona law that has been the law in Arizona for almost 100 years prior to about the year 2000. One of the cases I cited, Everett v. State of Arizona, held that the defendant only needs to raise slight evidence that he acted in self-defense. Then the burden of proof shifts to the State, and they must prove beyond a reasonable doubt that the defendant did not act in self-defense. Now, a lawyer faced with a defense lawyer faced with that scenario now all of a sudden has forced the State into proving its case twice. One, the defendant did it. Two, and it wasn't in self-defense. Now, the lawyer knew that. Had he read Everett very closely, Everett was a case very close, had very close facts. The only difference in Everett was the bar was in Tucson instead of Sedona. The crime occurred in 1959. There was a bar fight in the bar. The defendant left. The victim stalked him, caught him, threatened to kill him. And the defendant in Everett grabbed the victim and in the tussle stabbed him with a knife and killed him. The problem I have with your argument is that it really relates to a much you're going to have to stand over there. It relates to a much larger scenario here, because as you well know, you're familiar with the record, there was more than one lawyer on behalf of your client. And the first lawyer thought that the self-defense argument was one thing and planned to advance the self-defense argument. And it sounds like to me from reading this record that your client didn't like the self-defense argument. Well, that could be. Yeah. And Kelly first said he was going to plan this self-defense thing. And then the judge suggested there might be something wrong with that. You might not even get an instruction unless you have the facts to support it. So your client brought in another lawyer, Mr. Ray. Correct. And at that point, Lowery himself expressed dissatisfaction with the self-defense. And so Ray went with the other theory. And there were lots of reasons for that, including the yellow sheet thing and a bunch of evidence that he cited. And it seems to me that your client himself wanted the misidentification defense. Who's the lawyer, though? The lawyer makes those decisions. I know, but it's the totality of the circumstances, and there's plenty of reason why, and they ticked through this in the case, as to why there's a possibility that this misidentification defense is going to work. Plus, they decided in order for self-defense to work, they'd have to put Lowery on the stand. And that didn't seem like a great idea. Well, I beg to differ with the court. Now, I've done some criminal trials, and in certain events, you don't want your client anywhere near the stand. But in Mr. Lowery's case, the State did not produce Yellow Shirt as a witness. It was his word only describing what went on. And he could have truthfully, and I think very well, testified, hey, look, this guy had hit me in the face. I wanted my money back. We wanted to get going. He weighs me in this narrow hallway, and all of a sudden, I've got two guys on me, and I know what somebody in the Mexican Mafia will do when they take their shot. But Lowery never admitted that and never told Ray that he stabbed the guy. Well, I think the record, though, shows that from the PCR hearing, that he made a statement to Mr. Ray's associate that he had lunged out and had the knife in his hand and swung on him. Now, what I'm saying, Your Honor, is in response to, oh, you can't put Lowery on the stand, he wouldn't do well, I just beg to differ with the court, because I think Lowery could have easily answered all attacks on why he acted in the way he did. He would have to have admitted that he stabbed him. Yes, but he had already done that. He told the police. I didn't know I killed the guy. He abandoned that a million miles ago when he decided on the misidentification. Well, but if I may disagree respectfully with the court, I think what the court is doing is making the same argument that the State is. Oh, he wouldn't have won his case. That's not the standard. And, in fact, I think the State court judge misapprehended the proper standard when he said in his order, well, I can't imagine Lowery winning his case. That's not the standard. It is, is there a reasonable probability? I think there was a reasonable probability of a different result. Maybe not an acquittal, but maybe second-degree murder. Maybe manslaughter or maybe a hung jury. Because now you've got a. . . I'm sorry, Judge. Doesn't Mancheschi's testimony suggest that it was somebody other than Vasquez? You know, to be real kind to Mr. Mancheschi, I don't know if you can draw any rational conclusions from what that gentleman said. He, you know, he appears to be a guy who has a real Walter Mitty complex, and I think he injected himself into this case as being trying to save someone from getting hurt. His, I think the magistrate judge in Tucson found him to be the most incredible witness that one could see. All right. Thank you. Your time has expired. Thank you, Counsel. We'll hear from the government. I'm at somebody other than Lowery, but go ahead. Good morning. My name is Assistant Attorney General Robert Walsh, appearing on behalf of the respondents. Mr. Walsh. When this Court is reviewing a habeas petition, particularly in an ineffective assistance of counsel context, the Court has to give two layers of deference, one to the State courts in terms of whether or not they applied Strickland reasonably, and second to Mr. Ray and Mr. Adair's tactical decisions. Now, what we have here is two experienced attorneys. Mr. Ray was a certified specialist in criminal law who had practiced for many years investigating both defenses. Mr. Lowery had contacted them because he was upset that Kelly was going to present this self-defense case. The trial judge said, I don't even think I'm going to give you an instruction. You look like you have a pretty weak case. Mr. Lowery was offered 10 years, well, basically a plea that could have given him as little as 10 years, and the indications from the prosecution and the trial judge were, you're going to get that. He rejected that, went opinion shopping, contacted Mr. Ray. Now, Mr. Ray could have just said, hey, you don't want that self-defense defense, let me just go explore other avenues. Now, what Mr. Ray did was he actually filed a notice of disclosure where he reaffirmed the self-defense defense, but he went forward and he investigated other alternatives. He hired, unlike Mr. Kelly, four experts who looked at the physical evidence. And what they concluded was, was that the knife, the bloody knife that was found in the Jeep next to Mr. Lowery, was not the murder weapon. And I detailed in my brief why. We also have indications that Sergeant Stinson, who, by the way, was not available to testify at trial, who is a perfect person to pin the blame of planting the evidence, a la Mark Furman, that he had an opportunity to have done so because he was one of the first officers at the scene. He had access to the blood. He was seen talking in a yellow shirt. And he, you know, obviously could have, because he was the first person to receive the Jeep at the police station, have transferred the blood onto this particular knife. And Mr. Ray also called Mr. Suido to the stand, who basically testified, hey, if you have a knife that's in a core, why is there so much blood on this? Wouldn't it have washed off? Mr. Ray also consulted and had testified. The former medical examiner, chief medical examiner, Maricopa County, who also looked at this knife and, like Joe Collier, who was the person who was in charge of the Phoenix Crime Lab at one point in time, say, hey, if this was the murder weapon and the victim was wearing a shirt, where are the fibers of cloth and where is the tissue that would be there? Blood is an adhesive substance. It should be there. It wasn't there. There were also photographs that indicated that there was a hilt mark on the victim's chest. The knife was nine centimeters long. Had it gone all the way through to the hilt, it would have transected the aorta of the victim. Dr. Carnichnig basically said this isn't the weapon. So we have that particular aspect of the case. On top of that, like I established before, we have Stinson having the opportunity to do the planning. We have inconsistent descriptions as to where the knife was found. Was it wedged in the side? Was it on the top? We had conflicting stories from the police. You also have Yellow Shirt, who's being described in very suspicious terms. Charlotte Eichelboom said he was very suspicious-looking. I think the police should have stopped him or kept him around. Instead, he took off. You also have a witness say that he saw a scabbard, an empty scabbard in his belt. That was Jason Stevens, the news reporter, who saw Yellow Shirt outside the bar. Then you have Mr. Mincheski. And he said the assailant ---- Mr. Mincheski. Right. Well, I have to respectfully disagree with the magistrate in terms of really taking over the role of the jury, which was to basically weigh his credibility or not. One thing we do know was the trial counsel looked at this witness, and he said, look, yes, he has some vision problems, but he also could play pool. He could distinguish colors. He's actually won pool games. He was able to walk around this crowded bar with 100 people. And he was still able to do that. Actually, Officer Lopez had a blind brother and dealt with him and said that he was convinced that he could see something. So really what's important here is that the person who did the stabbing, according to Mr. Ray, was not the defendant, but rather someone wearing a light-colored shirt. And that was enough for Mr. Ray to say, look, I think Yellow Shirt is a better defense than self-defense. The Supreme Court in Strickland says that when a judge ---- I mean, I'm sorry, when a trial attorney investigates the law and investigates the facts, and they testified, both trial counsel, that they did, that their strategic decisions are virtually unchallengeable. And in this ---- Roberts. Did the misidentification defense depend in some way on the idea that there had been some misconduct or conspiracy by the police in connection with weapons? That's actually what the defense was. Mr. Ray did say, you know, that Mr. Stinson, Sergeant Stinson, had the opportunity to have done so. And so that was ---- But after the OJ case, how can one say that's a lousy defense? Well, actually, Mr. Ray testified that he had presented such aggressive defenses previously and had prevailed on them. So he believed that he could succeed doing that. So I want to talk about something else, though. I mean, the self-defense theory was going to be problematic for trial counsel because they would have to, as you noted, have Mr. Lowery get on the stand and admit to something he wasn't willing to do, which was that he had stabbed Mr. Vasquez in the chest and that he would have to acknowledge the fact that he knew what he was doing. Didn't he say that to the police? No. What he said was he cut the guy. And, you know, he basically said that if I didn't do it, I'd be ---- And he had it coming. It was self-defense. Right. Now, Mr. Ray acknowledged that. And what he basically said was cut who? I mean, we don't know if, for example, if it's just the cut on the knife of Mr. Vasquez's arm in the front, which I think Lowery did admit to at least, but also he had yellow shirt. And I have to be candid with you, Judge. When I first read the record, it didn't dawn on me why it was that Mr. Ray spent so much time talking about the blood splatter evidence and why didn't the Sedona Police Department do any sort of investigation of the blood, take samples. Well, he said I cut the guy. Who did he mean? Did he mean yellow shirt, the guy who was allegedly coming from behind, or Mr. Vasquez? But unless Mr. Lowery says, hey, I stabbed the guy, he's not entitled to a self-defense instruction anyway. If you look at State v. Gilfillan, which is the case that I cited when I was discussing self-defense, look at the last paragraph. It says that unless a defendant admits he did it, then you don't get an instruction. Is that black-letter, bright-line Arizona law? Well, according to be entitled to an instruction on self-defense, the defendant must admit. Basically, if he denies doing the act, how can he be entitled to an affirmative defense, which is I did it, but I was justified. There's a case called State v. Plough. But does he have to admit I stabbed him on the stand? I believe he does. What if there's six witnesses that testify to an attack where there's clearly self-defense? That's not enough? The guy doesn't take this right? I can understand what you're saying, but there was no evidence like that in this case because it was basically Yellowshirt who wasn't there and the victim who's dead and Mr. Lowery. And we have to remember that he – both Adair and Ray asked him what happened, and he never said I stabbed the man in the chest. Now, here's two problems with calling Mr. Lowery to the stand. Number one, if he's not being clear to his attorneys in the conference room when it's just them, how's he going to do when he has a prosecutor who the trial judge and all the defense attorneys recognized was exceptional across examination? Number two, this man had a .24 blood alcohol content. He was drunk. Lowery. Yes. And he also had a prior conviction for basically engaging in violent behavior while being drunk. Now, the trial court said, look, I'm not going to let you get into the conviction and impeaching him under Rule 609 because the California conviction was when he was a minor in a juvenile adjudication. But, prosecutor, I will allow you to question him about it under Rule 404B. So calling him to the stand was fraught with a lot of risk. And I think that when you take a look at the fact that Mr. Lowery actually had, you know, was not happy with the self-defense case. If he was happy with the possibility of getting a lesser included, then I submit to the Court that he would have taken that plea agreement and taken his 10 years. But he wasn't. He wanted an all-or-nothing defense. And so he was actually going forward with that. He did not want the self-defense case. And how can an attorney put his client on the stand knowing he doesn't believe in the defense and you're basically at war with your client's protestations of innocence? I do want to just address a couple of factual points that counsel addressed. Vasquez never said he was in the Mexican mafia. What he said was, don't F with the Mexican mafia, which could be a statement meaning, yes, Mr. Lowery, I'm in the Mexican mafia, but counsel said it probably could be Yellowshirt, who was the person that stabbed him, according to the defense theory. There's also something else that needs to be addressed. At no time did the defendant ever say, I thought these two men were armed. In fact, he testified at the Rule 32 evidentiary hearing. And there are three places I'd like the Court to look at. The April 23, 1998, transcript on page 241, what he says is, I didn't stop to see if he was armed. He also admitted on page 262 that he never saw Vasquez with a weapon. And on page 266 of the same transcript, in redirect, in response to his own counsel's questions, they asked him, did you see any weapons? He said, it was the last thing on my mind. In order to be entitled to an instruction, you have to show that it's reasonably imminent that you're going to need to use deadly physical force. And that was not here. So in its essence, he stipulated away his self-defense case. I see I'm out of my time. Thank you very much. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: Beezer, O'scannlain, Trott